**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **CRIM. ACT. NO. 1:24-cr-112-TFM** |
| | ) | |
| **GLENNIE ANTONIO MCGEE** | ) | |

**MEMORANDUM OPINION**

Defendant Glennie Antonio McGee ("McGee") filed several pretrial motions to suppress (Docs. 363, 389, 390, 617, 674). Based on the evidence presented to the Court, arguments of the parties, and for the reasons set forth herein, the Court orally denied the motions (Docs. 434, 435, 438, 710, 712, 713, 714, and 715) and indicated a written opinion would follow. This is that opinion. For the reasons discussed below, the motions to suppress all remain **DENIED**.

## I. BACKGROUND AND MOTIONS

On June 14, 2024, the United States submitted a Criminal Complaint against Defendant McGee which charged conspiracy to possess with intent to distribute cocaine (21 U.S.C. § 846) and possession with intent to distribute cocaine (21 U.S.C. § 841(a)(1)). *See* Doc. 1. The complaint was properly signed by a United States Magistrate Judge, and an arrest warrant was contemporaneously issued. *Id*; Doc. 2.

On June 27, 2024, the Grand Jury returned an indictment against McGee, his wife Echandza Maxie, and several others charging McGee with participating in a years-long drug conspiracy and related conduct. Specifically, the indictment charged McGee with the following: a Continuing Criminal Enterprise under 21 U.S.C. § 848 (Count One), Conspiracy to Possess with Intent to Distribute Cocaine under 21 U.S.C. § 846 (Count Two), Conspiracy to Possess with Intent to Distribute Fentanyl under 21 U.S.C. § 846 (Count Three), Possession of a Firearm in

Furtherance of a Drug Trafficking Crim under 18 U.S.C. § 924(c)(1)(A)(i) (Count Four), Possession of a Firearm by a Prohibited Person (Felon) under 18 U.S.C. § 922(g)(1) (Count Five), Distribution of Fentanyl under 21 U.S.C. § 841(a)(1) (Count Six), Possession with Intent to Distribute Cocaine under 21 U.S.C. § 841(a)(1) (Count Seven), Use of Persons Under 18 Years of Age in Drug Operations under 21 U.S.C. § 861(a)(2) (Count Eight), Possession with Intent to Distribute Cocaine under 21 U.S.C. § 841(a)(1) (Count Ten) and noted the applicability of the enhanced sentencing penalties under 21 U.S.C § 841 and forfeitures. *See* Doc. 7. On that same date, the Grand Jury returned a separate indictment for Maxie, McGee, and others for a years-long-conspiracy to commit fraud. *See United States v. Maxie*, Crim. Act. No. 1:24-cr-113-TFM (S.D. Ala.). Much of the discovery overlapped for both cases.

On September 25, 2024, the Grand Jury returned a superseding indictment charging McGee his wife Echandza Maxie, his sister-in-law Exavieria Maxie, and others. *See* Doc. 170. With regard to McGee, the charges were the same as those presented in the original indictment. *Id*.

On May 3, 2025, McGee filed his motion to suppress (Doc. 363) which he renewed on October 27, 2025 (Doc. 675).[1] In the motion to suppress, McGee sought to suppress statements he made which he alleged were in violation of his constitutional rights. Doc. 363. He also said that items seized during the search of the residence on Raspberry Lane fell outside the scope of the warrant which related to financial crimes. *Id*. McGee also alleged the search of the Raspberry Lane home was not made in good faith. Despite the title of the motion, there is little to do with

---

[1] After a mistrial in June 2025, counsel for McGee filed a pleading which contained hallucinated citations after using an artificial intelligence program. McGee requested and received new appointed counsel. Shortly thereafter, McGee announced he intended to proceed *pro se*. To ensure the future proceedings were not tainted by any mistakes or misconduct by his released defense counsel, the Court cleared any previously filed motions and reset the motions deadline. McGee renewed the motions through his filing on October 27, 2026 which the Court granted and reinstated the motions on November 5, 2025. *See* Doc. 680.

any purported statements made.  *Id*.  In essence it is more a suppression of a search.  Specifically, seeking to suppress jewelry, purses, shoes, watches, cash, jewelry appraisals, receipts for luxury items, a Draco firearm, ammunition, a money counter, a backpack, and other allegedly unrelated items seized ruing the search of his home at 2471 Raspberry Lane, Mobile, Alabama.

The United States filed its response on May 9, 2025.  *See* Doc. 375.  As noted in both the motion and the response, the search was conducted pursuant to a warrant sought and issued on December 19, 2022.  The United States included the probable cause affidavit explaining that during a Title III wiretap investigation of a different subject (John David Clarke), the FBI intercepted conversations between McGee, Clarke, and others discussing a tax fraud scheme.[2] Based on bank and phone subscriber records, tax records, information from cooperating defendants, wiretapped phone calls, and other evidence outlined in the agent's lengthy affidavit, the Magistrate Judge approved the search warrant.  The warrant authorized agents to search the property and any vehicles located at 2471 Raspberry Lane to locate and seize, among other things, records, electronic devices, and any additional evidence of McGee's fraud crimes.  The Magistrate Judge also approved a separate warrant that permitted agents to locate and seize McGee's cell phone.

On December 21, 2022, agents executed the search warrant at the Raspberry Lane house. Neither McGee nor his wife Echandza Maxie were present when the search began – though Echandza later arrived on the scene in a white Toyota Camry registered to McGee.  Agents called McGee to inform him of the warrant.  The agents asked him to come to the scene to secure the minor children who were home and to speak with agents.  McGee declined and never came to the

---

[2] These crimes were eventually charged in *United States v. Maxie, et al*, Crim. Act. No. 1:24-cr-113-TFM (S.D. Ala.).

scene during the search.  While the agents executed the search warrant, Echandza returned home and the agents saw in the backseat of the Camry a backpack with white residue lying next to a child's doll.  The agents made a probable cause seizure of the backpack believing it to be cocaine residue and a forensic chemist later confirmed that the residue was in fact cocaine.  In the safe of the master bedroom closet shared by McGee and Maxie, agents seized an AK-47 style Draco pistol, a magazine loaded with ammunition, and boxes of two types of ammunition.  The keys to the safe were in the same closet and easily accessible to any resident. Though the weapons were discovered during the initial search, the agent sought and received that same day a follow up search warrant from the Magistrate Judge to encompass those items.  Agents also found the foregrip for a pistol, bulk cash, a money counter, and evidence specific to the fraud scheme including a detailed ledger listing identifiers, identities of co-conspirators, and dollar amounts on fraudulent tax returns. Based upon the substantial evidence of fraud, the agents also seized numerous luxury items that appeared to be the fruits of either the fraud scheme, drug trafficking, or both.

When the agents were unable to seize McGee's cell phone at the December search, they applied for an additional warrant to seize the phone and to collect McGee's DNA.  The warrant was approved on March 20, 2023.  On March 29, 2023, the agents executed the warrant during a traffic stop after McGee left the Raspberry Lane residence in the same white Toyota Camry that Echandza drove during the December search.  Agents seized only one of the three phones in McGee's possession as the warrant only encompassed that phone.  McGee declined to consent the search or seizure of the other two phones.  During questioning, McGee lied about having access to the gun safe discovered during the prior search.  Agents extracted the contents of the cell phone which contained significant evidence of the fraud scheme, cocaine trafficking, and illegal possession of firearms.

On October 16, 2023, through counsel, McGee and Echandza filed a sealed Rule 41(g) motion for return of the property seized in the December 2022 search of the Raspberry Lane residence.  The United States agreed to return certain property including cash, jewelry, purses, and clothing while retaining possession of the other items.  The United States did so to avoid prematurely revealing the full scope of the ongoing investigation – including the existence of a wiretap.  However, the United States made clear that by returning it was in no way admitting the seizure was unlawful.  Therefore, the Rule 41(g) motion was denied as moot by the Magistrate Judge.  The items were returned on December 1, 2023.

The United States continued its investigation into McGee, Echandza, and the others as to both the fraud and drug trafficking.  In January 2024, agents obtained a recording of McGee discussing his drug enterprise including prices for bulk cocaine and fentanyl and his methods of laundering drug proceeds through real properties he owned.  On February 17, 2024, during a recorded meeting, McGee sold 1,000 fentanyl pills to a cooperating defendant during which McGee used the 2021 Cadillac Escalade registered to his wife Echandza.

On March 8, 2024, United States District Judge Kristi DuBose authorized a Title III wiretap on two of McGee's cell phones.  The agents commenced interception of McGee's communications on March 12, 2024 which revealed further evidence of McGee's drug-trafficking activity.  As a result, on March 30, 2024, agents seized more than a kilogram of cocaine and a pistol from the vehicle of one of McGee's drug couriers (Tierra Hill – also charged in the indictment and superseding indictment).  McGee learned of Hill's arrest when she texted him from her Apple Watch and he drove the Cadillac Escalade past the scene of the stop.  Immediately afterwards, he began communicating with Echandza and several other co-conspirators which the agents intercepted via the wiretap.  During one call, McGee said the police were surrounding one of his

stash locations and that he had instructed Hill's minor child to take a backpack full of cocaine to get rid of it. He said he told the child to jump the gate and throw it away. While executing a search warrant at the stash location, law enforcement encountered a three-year-old child emerging from the back door with a backpack which they found contained large amounts of cocaine. Inside the residence, agents found another backpack containing bulk cocaine and two more guns. The total amount of cocaine seized during the March 30, 2024 search was more than 4.1 kilograms.

On June 13, 2024, agents intercepted additional calls from McGee's sources of supply about bringing a bulk cocaine load to Mobile for McGee. That evening, deputies intercepted and arrested McGee in possession of 3 kilograms of cocaine which were sitting in his lap. They also executed a search warrant at a different stash location and seized an additional 2 kilograms of cocaine and 2 guns including another AK-47 style Draco pistol.

After his arrest and having received the *Miranda* warning, McGee admitted he had been trafficking bulk cocaine for at least seven years with a goal of making $20,000 in profit per month from drug trafficking. He also lied suggesting that he had sold all the high-end jewelry previously seized and returned. That same night agents intercepted Echandza and Exavieria calling various co-conspirators to alert them about what had happened. They then returned to the Raspberry Lane residence to try to clear everything out including the jewelry and gun to store it at Exavieria's place. However, agents ultimately seized most of the jewelry and gun by searching Exavieria's residence pursuant to a warrant. Prior to their arrival, Echandza learned of the likely search and contacted Exavieria's minor son to direct him to locate the gun and toss it from a balcony before law enforcement could find it.

On May 23, McGee filed two additional motions to suppress. *See* Docs. 389, 390. The first motion (Doc. 389) seeks to suppress phone location data, pen and ping orders, GPS tracker

data, pole camera video, and all related evidence. The second motion seeks to suppress the Title III wiretap warrants and evidence.

As to the first motion (Doc. 389), McGee requests a hearing to determine whether the execution of the search warrants violated McGee's constitutional rights and if there was no probable cause, then to suppress the evidence collected. The motion is at times confusing and short on law. He includes a lengthy "Statement of Facts" which provide Defendant's own interpretation and ultimately unsupported assertions regarding what evidence did or did not exist. Doc. 389 at 1-19. The Court need not recite it in full here as the record speaks for itself. The crux of the motion is that (1) agents relied too heavily on two cooperating witnesses who were both hardened criminals with extensive criminal records, so their statements should be considered dubious and (2) whether or not a fanny pack worn by McGee on a certain date contained a gun. He claims that the agents relied upon stale information from the cooperators and drew incorrect conclusions about McGee being armed. Consequently, he seeks suppression of the location data authorized by two state court warrants (Doc. 389 at 2-9), pen registers and trap/trace orders from a federal court (*id*. at 9), a GPS tracker warrant on the 2021 Cadillac Escalade (*id*. at 9-12), pole camera footage at 621 Euclid Avenue (*id*. at 12-13), GPS tracker data for a 2015 Nissan Altima (*id*. at 13-15), GPS tracker data for a 2021 Dodge Durango (*id*. at 15), and essentially everything collected from the seven state and federal warrants (*id*. at 15-18). The memorandum of law section is particularly thin in that it cites general fourth amendment law with little to no application to the matters for which he seeks suppression. *Id*. at 18-22. He further ignores precedential law on the various issues to include basic issues such as standing.

With regard to the wiretap warrants raised in the second motion (Doc. 390), McGee alleges a lack of probable cause, a failure to disclose and exhaust other investigative means, and a failure

to minimize the calls between Glennie McGee and Echandza Maxie.  After a brief recitation of the law on probable cause, there is no explanation in the motion as to exactly what McGee alleges here.  *Id*. at 4.  As to the next allegation (failure to disclose and exhaust other investigative means), again there is a brief recitation of law, but the only statement McGee makes is "[n]ot only did officers fail to exhaust traditional investigative means, they failed to even disclose that a controlled buy had been successfully used."  *Id*. at 4-5.  The remaining 3 pages of the motion are dedicated to the section on failure to minimize the conversations between McGee and Echandza (his wife).  McGee claims the affidavits mischaracterize McGee and Maxie as romantic partners and not as husband wife.  McGee also claims the affidavit paints a false picture that Echandza was involved in the drug trafficking organization because she was observed through physical surveillance.  McGee argues that this is solely because they have been married for 11 years.  He further argues that Echandza should have never been the target of any of these wiretaps.  McGee then references a different call recorded between Echandza and another unidentified woman.

The United States filed its omnibus response on May 27, 2026.[3]  *See* Doc. 405.  In the response, the United States lays out additional investigative timeline information not included in McGee's motion.  On December 13, 2023, agents executed a federal search warrant at 901 Telegraph Road, Prichard, Alabama during which agents encountered and seized a phone from one of McGee's unindicted co-conspirators.  Less than two weeks later on December 22, 2023, agents monitoring surveillance cameras at that location saw McGee drive his Cadillac Escalade to the Telegraph Road home where he met with the co-conspirator.  During the meeting they observed

---

[3] The omnibus response also relates to a motion objecting to the United States' expert witness disclosures. (Doc. 386).  The Court previously gave an oral ruling and articulated its reasoning on the record.  *See* Doc. 452.  This opinion need not address that motion, but the Court notes it here since the omnibus response includes it.

what they believed to be a firearm on McGee's person which would be a crime because they knew McGee to be a convicted felon.  On January 13, 2024, agents obtained a recording of a call between a cooperating witness and McGee.  During the call, McGee asked to buy a kilogram of cocaine and if the seller could offer a better price than $17,500 per kilogram.  On January 18, 2024 and January 23, 2024, Agent Bagley applied and obtained a warrant to receive the phone location data from the two phones at issue – both of which belonged to McGee.  In his probable cause affidavits, Agent Bagley discussed that agents had obtained corroborated information from confidential sources that McGee was involved in bulk drug trafficking and they had seen him in a parking lot with the co-conspirator while armed.  On January 19, 2024, the United States applied for pen/trap orders for McGee's two cell phone numbers pursuant to the Pen Register and Trap and Trace Devices Act, 18 U.S.C. § 3121, *et seq*.  The affidavit relied upon the same corroborated information from the source of information as well as the agents' surveillance.  The Magistrate Judge authorized the pen/trap orders the same day. Later in the day on January 23, 2024, the agents obtained another recording, this time of an in-person meeting between McGee and the same source of information at the Telegraph Road location.  During the meeting, McGee arrived in his Escalade and discussed selling bulk cocaine and fentanyl, negotiated prices for bulk narcotics, and laundering money through real properties.  McGee also offered to sell the source of information fentanyl pills which he later did on February 17, 2024.  On February 8, 2024, agents installed a court-authorized GPS tracker on a 2015 Nissan Altima belonging to Tierra Hill – one of McGee's couriers.  On February 20, 2024, agents installed a pole camera near one of McGee's alleged distribution locations, 621 Euclid Avenue, Mobile, Alabama after obtaining a warrant from a state court judge on February 13, 2024.

On March 8, 2024, the case agent submitted a Title III wiretap application to intercept

communications over two of McGee's cell phones.  He included a 117-page affidavit outlining the probable cause and necessity of the wiretaps.  He detailed the agents' other efforts including prior court-ordered wiretap interceptions, confidential sources, physical and GPS surveillance, controlled purchases, pen/trap and toll records, pole cameras, grand jury subpoenas and financial records, and search warrants.  The United States District Judge authorized the wiretaps on March 8, 2024.  On March 11, 2024, agents attended a minimization briefing and began the intercepts the next day.  The interceptions ultimately led to the March 30, 2024 arrest of Hill while she was in possession of multiple kilograms of cocaine and guns.  The interceptions also captured McGee's directions to Hill's child to get rid of the cocaine at the stash house and when agents arrived, they encountered several children exiting the home including the one eight-year-old who had been instructed to get rid of the drugs and another three-year old wearing a backpack full of cocaine.

On April 4, 2024, agents obtained the warrant to install a GPS tracker on a 2021 Dodge Durango owned by another unindicted co-conspirator.

On April 16, 2024, agents installed a CCTV device in the Cadillac Escalade which had been authorized under the Title III wiretap orders.  The CCTV footage captured relevant communications as to drug trafficking and also video of McGee handling drugs.  On April 30, 2024, the United States applied to intercept two more cell phone numbers used by McGee.  Agents supplied a 157-page affidavit describing the progress of the investigation and the need for the additional wiretaps.  The Title III application was approved by a United States District Judge.

On May 8, 2024, the case agent applied to extend the interceptions over one of McGee's phone numbers, the CCTV interception within the Escalade, and to initiate a new interception of communication over a phone used by a co-conspirator (Antonio Reed).  The application included a 192-page affidavit, and a United States District Judge authorized the wiretaps.

Finally on May 30, 2024, the case agent applied to extend the interceptions over two of McGee's phone numbers, to extend the CCTV interceptions in the Escalade, and to initiate interception of communications from phones used by two of McGee's drug suppliers. The application was supported by a 223-page affidavit and again a United States District Judge extended the wiretaps.

In its response to the motions to suppress, the United States notes that several matters raised in the motion to suppress – i.e. pen/trap orders and pole-camera footage are not subject to a Fourth Amendment analysis as McGee had no reasonable expectation of privacy. The United States also asserts that McGee fails to address standing in his motions to suppress, and even for those areas where he could raise suppression issues, the motions fail to address with the probable cause standard or the good faith exception. The United States further argues that McGee has not made sufficient allegations to merit a hearing. As for the wiretap suppression motion, the United States argues that McGee again fails to address the hundreds of pages contained in the various affidavits and that even if they were somehow defective, he fails to address the good faith exception. Finally, addressing McGee's minimization argument, the United States notes that an exception to the marital privilege exists for co-conspirators.

Though not required as discussed below, the Court held a hearing on the various motions on June 5, 2025 – especially because the motions were filed so late and trial was scheduled to start the following week. This permitted the Court to issue oral rulings with a written opinion to follow on the motions to suppress. Later, after a mistrial and a "reset" of the case after misconduct committed by McGee's counsel, the Court allowed for new motions and held a second hearing on December 1, 2025. This hearing included any arguments made as they related to Echandza's own motion to suppress.

## II.   LAW AND DISCUSSION

### A.   Need for a Hearing

The United States Supreme Court determined "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

McGee makes generalized assertions of falsity, misleading statements, or omissions from the affidavit, but he makes no specific allegations against any agent.  In later filed pleadings, McGee makes generalized allegations regarding falsity as it relates to a fanny pack and the officers/confidential informant indicating it could be a weapon.  Even when reviewing it from the standpoint most favorable to McGee, the Court finds that while it may or may not have ultimately contained a weapon, the photos and surveillance show that it seems likely McGee had a weapon in the fanny pack.  No retroactive lookback affects what the officers and agents reasonably believed at the time.  Beyond the barebones statements, McGee makes no further reference in his motion to material omissions.

"To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof."  *Id*. at 171-72; *see also United States v. Novaton*, 271 F.3d 968, 986 (11th Cir. 2001) (quoting *Franks* and applying its analysis when evaluating an affidavit offered in support of a wiretap order).  The Court agrees with the government that without a specific allegation of false statements or material omissions by government agents supported by

an offer of proof, a hearing is not necessary to determine the necessity issue.  Neither McGee nor

Echandza make such specific assertions accompanying by an offer of proof.    However, while the

law does not mandate a hearing, there is nothing which precludes the Court from holding one.  As

such, out of abundance of caution and given the lengthy sentences these defendants faced if

convicted, the Court elected to hold a hearing.

**B.     Standing[4]**

It is well established that for a defendant to move to suppress evidence, he must have

standing.  *United States v. Eyster*, 948 F.2d 1196, 1208-09 (11th Cir. 1991).  A defendant has the

burden of showing standing under the Fourth Amendment.  *See United States v. Brazel*, 102 F.3d

1120, 1147 (11th Cir. 1997) (citing *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir.

1984)). To claim the protection of the Fourth Amendment, an individual must have a "legitimate

expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (citing

*Katz v. United States*, 389 U.S. 347, 353 (1967)); *see also Brazel*, 102 F.3d at 1147 ("To have

standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area

searched.").   "[I]n order to claim the protection of the Fourth Amendment, a defendant must

demonstrate that he personally has an expectation of privacy in the place searched, and that his

expectation is reasonable; i.e., one that has a source outside of the Fourth Amendment, either by

reference to concepts of real or personal property law or to understandings that are recognized and

---

[4] Standing in this context is different than the traditional use of the word standing as it relates to
the Article III case-and-controversy requirement.  The Article III context presents a "threshold
*jurisdictional* question which must be addressed prior to an independent of the merits of a party's
claims."  *United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (quoting *AT&T Mobility,
LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.2d 1356, 1359 (11th Cir. 2007)
(emphasis added).  Whereas, in the context of a Fourth Amendment suppression challenge, "[t]his
threshold issue—whether an individual has a reasonable expectation of privacy in the object of the
challenged search—has come to be known colloquially (but as it turns out misleadingly) as Fourth
Amendment 'standing.'"  *Ross*, 963 F.3d at 1062.

permitted by society." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (citations and internal quotation marks omitted). That said, "[s]tanding does not require an ownership interest in the invaded area." *United States v. Hernandez*, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of privacy in that home).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006)). Courts assess on a case-by-case basis the standing of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States*, 466 U.S. 170, 191 n. 13 (1984). Moreover, the Eleventh Circuit has held that where a defendant is neither the owner nor the lessee of the place searched, in order to contest a search, he must "demonstrate a significant and current interest in the property at the time it was searched." *United States v. Miller*, 387 F. App'x 949, 951 (11th Cir. 2010) (citation and internal quotation marks omitted);[5] *see also Harris*, 526 F.3d at 1338 (quoting *United States v. Espinosa-Orlando*, 704 F.2d 507, 512 (11th Cir. 1983)) ("A legitimate expectation of privacy [must] be proven by factors beyond mere possession, such as a right to exclude or a right to privacy.").

i.      **Wiretap**

Standing in the context of a wire communication is coextensive with standing under the

---

[5] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

Fourth Amendment. *Alderman v. United States*, 394 U.S. 165, 176 n. 9 (1969); *United States v. Brazel*, 102 F.3d 1120 (11th Cir. 1997). To challenge an order permitting the interception of communications, a defendant must establish that he was an "aggrieved person." *See* 18 U.S.C. § 2518(10)(a). An "'aggrieved person' means a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The statute permits an "aggrieved person" to move to suppress the contents of any wire or oral communication intercepted. 18 U.S.C. § 2518(10)(a). In other words, a defendant has standing only in those communications in which they were a participant or occurred on his premises. *United States v. Scasino*, 513 F.2d 47, 50 (5th Cir. 1975).[6] Standing is not conferred on co-conspirators or co-defendants who are not parties to or targets of the intercepted communications merely because they are ultimately implicated by evidence obtained during the surveillance. *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978).

To have standing, a defendant must show "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises." *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006). While the defendants only have standing as to the conversations in which they were captured, if they were a target, or those that occurred on their respective premises, that obviously gives rise to their ability to challenge the Government's need to obtain the wiretap order that is subject to this motion.

To the extent McGee challenges the conversations between Echandza Maxie and other persons, he makes no effort to establish standing. He is not a party to the conversations. However, some of those conversations involved did occur in the Cadillac Escalade which was his vehicle

---

[6] The Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

and the wiretap efforts were directed at him.  The Court believes that would likely constitute a premises which would satisfy the third prong of "the interception took place on his premises."  To the extent there are calls that occurred in the Cadillac Escalade, the Court will assume he has standing.  To the extent the interceptions occurred elsewhere or on other co-conspirator's phones, McGee lacks standing to challenge those calls.

### ii.    Other search warrants for homes, vehicles, and phones

#### a.    Items owned by other individuals (Doc. 389 at 13-15)

To the extent McGee challenges the GPS trackers placed on Tierra Hill's Nissan Altima (Doc. 389 at 13-15) or the Dodge Durango owned by another co-conspirator (Doc. 389 at 15), McGee lacks the standing to challenge them as he does not have a reasonable expectation of privacy.  McGee also lacks standing as to any of the other residences searched that were not owned by him.  Finally, he lacks standing as to phones seized and searched that belong to other individuals.

#### b.    Pole Camera (Doc. 389 at 12-13)

McGee also challenges the pole camera placed outside on a public utility pole pointed at 621 Euclid Avenue.  McGee misses the mark in his challenge and does not cite to a single case in this section.  The Court agrees with the United States that when reviewing the circumstances of this particular pole camera, McGee did not have a reasonable expectation of privacy in the area surveilled and therefore the motion to suppress fails.

The Eleventh Circuit recently addressed a pole camera pointed at a defendant's residence. *United States v. Gregory*, 128 F.4th 1228 (2025).[7]  In that case, the defendant challenged pole

---

[7] The United States references in the oral arguments "there's published cases from this year in the 11th circuit that state that there's no reasonable expectation of privacy in the installation of a pole camera of a place."  Presumably, the United States was referencing *United States v. Gregory*, 128

cameras arguing that invaded his reasonable expectation of privacy because they were focused on his home and recorded non-stop. The Eleventh Circuit rejected the defendant's arguments. The court held that the defendant did not have a reasonable expectation of privacy in the areas surveilled. Specifically, the Eleventh Circuit stated:

> First, we cannot say Williamson had a reasonable expectation of privacy in the areas surveilled—the front area and backyard of his home—because they were both exposed to the public. *See Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Id*. The front area, by all accounts, was entirely visible to the public. And the back area, Williamson himself concedes, is not fully enclosed. The magistrate judge expressly found that "an observer standing [on a public road] could see into the Arlington Avenue House's back yard, with her view obstructed only by some overgrown vegetation." And Williamson does not challenge that factual finding as clearly erroneous.
>
> Williamson nonetheless argues that the Colorado Supreme Court's decision in *People v. Tafoya*, 2021 CO 62, 494 P.3d 613 (Colo. 2021), supports his position. But we disagree. In *Tafoya*, police mounted a pole camera across the street from Rafael Tafoya's house without first securing a warrant. *Id*. at 614. The pole camera continuously recorded footage of Tafoya's property—including his backyard, which was otherwise hidden by a six-foot-high privacy fence—for over three months. *Id*. The court held that "police use of the pole camera to continuously video surveil Tafoya's fenced-in curtilage for three months, with the footage stored indefinitely for later review, constituted a warrantless search in violation of the Fourth Amendment." *Id*. at 618. But when doing so, it recognized that "a person standing on the street could not see into the backyard"—giving rise to a subjective expectation of privacy. *Id*. at 622 (emphasis added). Williamson's surveilled areas, on the contrary, were visible by and exposed to the public—providing him no such expectation of privacy. *See United States v. Dennis*, 41 F.4th 732, 740-41 (5th Cir. 2022) (explaining that the use of a pole camera was not a search because "one can see through [the defendant's] fence and [thus] the cameras captured what was open to public view from the street"). Because Williamson's backyard was open to public view from an observer standing on the street, we need not—and do not—address

---

F.4th 1228 (11th Cir. 2025) as that is the citation used in its written response. The United States in its oral argument seemed to imply that a pole camera never implicates a privacy interest. The Court believes that may oversimply or be an overly broad statement about the holding in *Gregory*. The United States' written response is more accurate than its oral statement – in that the law seems clear on a pole camera mounted and pointed at a public place. *Gregory* does seem to hold back on pole cameras that may access more private areas – such as those including a back yard. Regardless, that is not the situation presented here and the Court need not delve further on the issue.

whether the use of a pole camera to record over a privacy fence into an otherwise enclosed backyard invades a reasonable expectation of privacy.

Second, the pole cameras' capacity to record non-stop does not transform the Fourth Amendment analysis in the manner Williamson suggests. Nothing in the Constitution forbids the government from using technology to conduct lawful investigations more efficiently. The authorities Williamson cites for support— Justice Alito's and Justice Sotomayor's concurrences in *United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) and the Supreme Court's decision in *Carpenter v. United States*, 585 U.S. 296, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018)—are wholly consistent with that principle.

*Gregory*, 128 F.4th at 1241.

Much like the situation in *Gregory*, the pole camera at issue here was pointed at an area fully visible to the public – i.e. the front yard and the driveway.  Therefore, McGee had no expectation of privacy in that public area even if it is located in front of a residence.  *See also United States v. Ross*, 963 F.3d 1056, 1062 (11th Cir. 2020) (noting that "an individual's Fourth Amendment rights are not infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy" such as a public road).[8]

Therefore, the motion to suppress the pole camera is denied.

c.      **Pen/Trap Data (Doc. 389 at 9)**

McGee's challenge is superficial, generalized, and lacks particularity.   Pen/trap applications are sought pursuant the Pen Register and Trap and Traces Devices Act, 18 U.S.C. § 3121, *et seq.*  The law is well-established that the installation of a pen register or trap and trace

---

[8] The Court notes that there is an ongoing discussion post *Carpenter* on the issue of warrantless pole camera surveillance. *See United States v. Goins*, Crim. Act. No. 3:23-cr-15, 2025 U.S. Dist. LEXIS 84410 at*11-12, 2025 WL 1285936 (W.D. Va. May 2, 2025) (collecting cases).  That is a non-issue here as the pole camera was placed after receiving approval from a state court judge. Therefore, even if this did constitute a search, it was still authorized by a court of competent jurisdiction which would then allow for the application of the *Leon* good faith exception as discussed later in this opinion.  The Court further finds that the affidavit supporting the application was well-supported despite McGee's argument to the contrary.

does not amount to a search under the Fourth Amendment and does not warrant the application of the exclusionary rule. *Smith v. Maryland*, 442 U.S. 735, 745-46 (1979). Thus, McGee cannot state a claim under the Fourth Amendment, even if his allegations were particularized. Nor does the federal statute providing procedures for pen registers require exclusion of evidence obtained in violation of its provisions. *See* 18 U.S.C. § 3121; *United States v. Thompson*, 936 F.2d 1249, 1249-50 (11th Cir. 1991). Put simply, the Eleventh Circuit has stated "information obtained from a pen register placed on a telephone can be used as evidence in a criminal trial even if the court order authorizing its installation does not comply with the statutory requirements." *Thompson*, 936 F.2d at 1249-50.

Accordingly, because of all the deficiencies highlighted above — i.e. lack of particularity and specificity and the unavailability of any remedy under constitutional and statutory law — the motion, to the extent it seeks to challenge any particular pen register or trap and trace warrant, fails and is denied.

## C.      Search warrants (Doc. 389)

As the Court has now moved beyond the items for which McGee's standing was at issue, the Court now turns to the issue under which he does have a reasonable expectation of privacy but will address the wiretap interceptions in its own independent section.

While the Court will address each remaining suppression requests briefly in turn, the general gist of McGee's assertions is that the affidavits are in some way defective because (1) they include information from two confidential sources with criminal histories and (2) include an alleged misrepresentation on what agents believe they saw in surveillance video on whether or not McGee was armed. Both arguments miss the mark.

An affidavit accompanying a warrant application seeks to provide a judge with probable

Page 19 of 34

cause for the issuance of the requested warrant. Having reviewed each one independently, the Court finds that they do meet the threshold for establishing probable cause. First, many investigations rely upon the use of confidential informants. Many, if not most, confidential informants have their own criminal records. That alone does not disqualify law enforcement from relying upon the information. In fact, as later argued in the wiretap suppression motion, the use of confidential sources to make controlled buys is a regular means of information gathering utilized by law enforcement. Indeed, "mutually enforcing and corroborative information from confidential sources is a strong indicator of probable cause even when the individual reliability of the sources is not clearly established." *United States v. Weinrich*, 586 F.2d 481, 490 (5th Cir. 1978)); *see also United States v. Hyde*, 574 F.2d 856, 864 (5th Cir. 1978) (holding that a "mutually corroborating story" told by multiple confidential sources "demonstrates to the magistrate a reasonable basis to believe that the confidential sources are reliable"); *United States v. Grant*, 2024 U.S. App. LEXIS 19487, at *8, 2024 WL 3650210, at *3 (11th Cir. Aug. 5, 2024) (unpublished and quoting *Weinrich*).

In addition to the statements from the confidential sources, evidence already collected by the time the warrants at issue were sought, law enforcement had already seized cocaine from one of McGee's alleged suppliers, found cocaine residue and a gun containing McGee's DNA at a search of his Raspberry Lane home, and had obtained text messages from McGee's phone in which he discussed selling cocaine. This information well-corroborated the statements of the two informants. *See United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) ("[W]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.").

Next, as to the arguments that the fanny pack was just a fanny pack and was not a firearm,

again McGee misses the mark.  The question is not whether it ultimately turned out to be a firearm, but whether agents reasonably believed they saw McGee with a pistol on his waist.  Even if they were ultimately wrong and the item was not a gun, the issue is probable cause and not absolute certainty.  *See United States v. Smith*, 459 F.3d 1276, 1291 (11th Cir. 2006) ("In dealing with probable cause . . . we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.").

McGee makes blanket assertions of falsity but having heard the testimony from the law enforcement agents and officers during the hearing, the Court finds them to be credible and that they believed the surveillance showed a weapon, but in retrospection they cannot be certain whether the fanny pack did or did not contain a gun.  The Court itself also looked at the surveillance video and photos, and it would be easy and reasonable to conclude that McGee appeared to be armed at the time.  Nothing before the Court even remotely indicates the agents deliberately tried to mislead the judges who signed the warrants.

i.      **Location Data (Doc. 389 at 2-9)**

The information referenced here is contained in the Ping orders which include the supporting affidavits.  The orders are dated January 18, 2024 and January 23, 2024.  *See* Doc. 403-8.  Both supporting affidavits were completed and submitted by Special Agent Tyler Bagley to the respective Alabama district judges.  In reviewing the affidavits, there is sufficient probable cause for the issuance of the location data concerning the target telephones.  Even if one were to remove the language about McGee being armed (as argued by McGee), there would still be sufficient

probable cause for the issuance of the location ping order.  Therefore, McGee's arguments for suppression fail.

### ii.   GPS Tracker for Cadillac Escalade (Doc. 389 at 9-12)

The search warrant and affidavit related to placing a GPS tracker on McGee's Cadillac Escalade were signed by an Alabama state court judge on January 23, 2024.  *See* Doc. 403-10. Deputy Alvin Latner submitted his request, and the affidavit includes the information about McGee moving fentanyl among his known properties and then surveillance where he appeared to be armed in December 2023.  Again, as previously noted, in reviewing the surveillance, it is easy to reasonably conclude that McGee was armed.  However, even if he was not, it does not mean that the information must be excluded absent a showing of intentional falsity or misleading the judge.  Nor does it automatically render the warrant defective.  Even without the information about McGee being armed, the remaining information contained in the affidavit is more than sufficient for the issuance of the GPS tracker.  Therefore, McGee's arguments for suppression fail.

### D.   Search Warrant - Items Seized Outside the Scope of the Warrant related to Raspberry Lane Search (Doc. 363)

As noted, on December 19, 2022, FBI Special Agent Joseph Simmons applied for a warrant to search McGee's house and any vehicles located at his residence at 2471 Raspberry Lane.  *See* Doc. 371-1.  The Magistrate Judge reviewed and issued the warrant on the same day.  *Id*.  To obtain the search warrant, Agent Simmons submitted a 45-page affidavit outlining the details of an investigation in which the FBI intercepted conversations between McGee, John Clarke, and others.  Clarke was the target of a separate Title III wiretap and was under investigation for conspiracy to distribute bulk cocaine and a massive tax-fraud scheme dating back to 2020.  Based on bank and phone subscriber records, tax records, information from cooperating defendants, wiretapped phone calls, and other evidence outlined in SA Simmons's lengthy affidavit, the

Magistrate Judge approved the search warrant.  *Id*.  The Magistrate Judge also approved a similar warrant that permitted agents to locate and seize McGee's cell phone.  *See* Doc. 374-1.

While the general gist of the search warrant focused on McGee's involvement in the financial fraud, that in no way requires the law enforcement agents to ignore evidence of another crime that they locate during the search.  During the search – which the Court finds was conducted in a reasonable manner – law enforcement found evidence of other crimes to include the backpack containing apparent cocaine residue in the Toyota Camry driven by Echandza, the gun and ammunition in the safe (which McGee was prohibited from being able to access due to his status as a felon), the foregrip for a pistol, bulk cash, and a money counter.  This is all in addition to the evidence collected relating to the fraud – including a ledger and numerous luxury items that were seized as evidence because they appeared to well exceed the McGee and Echandza's purported legitimate income.

None of these actions exceed the scope of the warrant as the officers are not required to put on blinders to items they see during a validly conducted search.  Moreover, with regard to the firearm, Agent Simmons obtained a follow-up search warrant from the same Magistrate Judge later that day.  *See* Doc. 371-1.  The additional affidavit includes the discovery of suspected narcotics and the firearm and related ammunition during their search pursuant to the original search warrant.

Agent Simmons also reapplied for a warrant to seize McGee's cell phone (since they did not secure it during the first search) and applied to collect McGee's DNA.  The warrant was approved on March 20, 2023.  Doc. 374-6.  After seizing those items during a proper traffic stop, they found additional evidence of the financial fraud, cocaine trafficking, and illegal possession of firearms when they extracted the contents of McGee's phone.

Despite his many protestations to the contrary, McGee has not established that at any point

the agents exceeded the scope of a proper search. But "elaborate specificity" is not required. *United States v. Peagler*, 847 F.2d 756, 757 (11th Cir. 1988). Even though a warrant is required to be particular in describing the place to be searched and the person or things to be seized, particularity does not guard against "intrusion per se" but against "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also United States v. McCall*, 84 F.4th 1317, 1327 (11th Cir. 2023) (citing *Coolidge*); *United States v. Williamson*, 2026 U.S. App. LEXIS 18972, 2026 WL 1876371 (11th Cir. June 30, 2026) ("The particularity requirement is intended to protect individuals from being subjected to general, exploratory searches."). Yet, the particularity requirement must "be applied with a practical margin of flexibility, depending on the type of property to be seized," and the property description need only be "as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982).

"The permissible scope of a search is governed by the terms of the warrant, and the search may be 'as extensive as reasonably required to locate the items described in the warrant.'" *United States v. Moon*, 33 F.4th 1284, 1296 (11th Cir. 2022) (quoting *Wuagneux*, 683 F.2d at 1352. "The reasonableness of the search depends upon the complexity of the crime being investigated and the difficulty involved in determining whether certain documents contain evidence of that crime." *Moon*, 33 F.4th at 1296-97 (quoting *United States v. Sawyer*, 799 F.2d 1494, 1509 (11th Cir. 1986)). Moreover, "the Supreme Court has recognized that effective investigation of complex white-collar crimes may require the assembly of a 'paper puzzle' from a large number of seemingly innocuous pieces of individual evidence." *Wuagneux*, 683 F.2d at 1349. "When a warrant authorizes the seizure of documents, 'an officer acting pursuant to such a warrant is entitled to examine any document he discovers,' in order 'to perceive the relevance of the documents to the

crime.'" *Moon*, 33 F.4th at 1297 (quoting *United States v. Slocum*, 708 F.2d 587, 604 (11th Cir. 1983).

In applying the practical flexibility to items seized pursuant to a search warrant, "[t]he seizure of items not covered by a warrant does not automatically invalidate an otherwise valid search" and that "[t]he crucial inquiry is always 'whether the search and seizures were reasonable under all the circumstances.'" *United States v. Schandl*, 947 F.2d 462, 465 (11th Cir. 1991) (citations omitted). "Such things as the scope of the warrant, the behavior of the searching agents, the conditions under which the search was conducted, and the nature of the evidence being sought must be considered in determining whether or not the search was reasonable." *Id*. (citation omitted).

Moreover, "[t]otal suppression of all items seized, including items within a warrant's scope, is not appropriate unless the executing officers' conduct 'exceeded any reasonable interpretation of the warrant's provisions.'" *United States v. Khanani*, 502 F.3d 1281, 1289 (11th Cir. 2007) (quoting *Wuagneux*, 683 F.2d at 1354). Unless agents display a "'flagrant disregard' of the terms of the warrant, the seizure of items outside the scope of a warrant will not affect admissibility of items properly seized." *Id*. (quoting *United States v. Lambert*, 887 F.2d 1568, 1572 (11th Cir. 1989)). Finally, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

In the case at hand, though the agents were at the house to execute a search warrant that related to fraud, the plain-view doctrine applies to the drugs, firearm, and firearm related items McGee challenges. *See Horton v. California*, 496 U.S. 128, 135 (1990). "An example of the

applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." *Id.* (quoting *Coolidge*, 403 U.S. at 465). However, the officers must still have probable cause to believe that the object in plain view is contraband. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Here, they knew McGee was a felon and could not lawfully possess a firearm or ammunition. They found the safe in the shared closet where it was readily accessible with the key hanging there and the grip was contained in McGee's nightstand. Therefore, the seizure of the firearm and related materials was certainly supported as reasonable and grounded in the law. Further, Agent Simmons went beyond legal necessity by going back to the same Magistrate Judge to obtain a follow up warrant to ensure the seizure was appropriate. This diligence should be commended, not condemned.

Additionally, as for the drugs and drug-related materials, there was also sufficient probable cause to support their seizure under the plain-view doctrine. "In dealing with probable cause we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *United States v. Smith*, 459 F.3d 1276, 1291 (11th Cir. 2006) (citations and internal modifications omitted). Here, the agents were already aware that McGee was likely involved in drug trafficking – specifically cocaine. Though that was not the specific purpose of the search – the officers are not required to put on blinders and ignore obvious evidence of drug related activity. The backpack found in the vehicle had what appeared to be cocaine residue.

Finally, with regard to the seizure of the luxury items (e.g. jewelry and purses among other things) and bulk cash, the agents had sufficient cause to seizure those items under the warrant itself

– as it allowed for the seizure of items related to the fraud conspiracy.  The agents were aware of the purported legitimate income reported by McGee and Echandza and the items seized appear to be the fruits of the alleged conspiracy.  All of which places them squarely in the purview of the search warrant.

Put simply, at no point does the Court find that the items were unreasonably seized outside the scope of the warrant or not otherwise supported by probable cause.  In looking at the totality of the circumstances, the agents' conduct was reasonable.  The Court finds no societal purpose in the suppression of the evidence seized and therefore McGee's motion merits denial.

### E.   Wiretap Authorizations (Doc. 390, 617)

A court's wiretap order issued pursuant to Title III enjoys a presumption of validity. *United States v. Weber*, 808 F.2d 1422, 1423 (11th Cir. 1987).  Therefore, the Defendants bear the burden of overcoming this presumption of validity.  *See United States v. De La Fuente*, 548 F.2d 528, 534 (5th Cir. 1977); *accord Weber*, 808 F.2d at 1424 (citing *De La Fuente* and the presumption of validity).

Pursuant to 18 U.S.C. § 2518(1)(c), an application for an order authorizing a wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  "Based on the application, the district court may grant an ex parte order if it determines that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous . . ."  *United States v. Hyppolite*, 609 F. App'x 597, 606 (11th Cir. 2015) (quoting *United States v. Alonso*, 740 F.2d 862, 867-68 (11th Cir. 1984)).  "The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed."  *United States*

*v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986); *see also United States v. Harrell*, 635 F. App'x 682, 684-85 (11th Cir. 2015) (quoting *Van Horn*).  The affidavit need not demonstrate that the police exhausted every conceivable technique before applying for a wiretap.  *Alonso*. 740 F.2d at 868.  Nor does the statute intend "to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques."  *Id.* (quoting *United States v. Hyde*, 574 F.2d 856, 867 (5th Cir. 1978)).  Partial success by other alternative investigative measures does not render electronic surveillance unnecessary and it can still be used if the government can "show why alternative measures are inadequate for 'this particular investigation.'"  *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (quoting *United States v. Carranzana*, 921 F.2d 1557, 1565 (11th Cir. 1991)).  Put simply, the application must show a substantial investigative need.

In the instant affidavits, each contains elaborate and detailed accounts of law enforcement's techniques which have met (or would have likely met) with limited success and failure.  The investigation had met with limited success in some areas such as controlled purchases of cocaine, the use of confidential informants, and several other warrants procured from both state and federal judges including the search of the Raspberry Lane residence (which resulted in finding evidence related to both drugs and financial fraud), pole cameras, pen registers/toll analysis, and physical surveillance.  However, even with this evidence, they had not adequately determined the size and scope of the potential criminal conspiracy.  In addition, the agent set out in great detail why other law enforcement techniques were inadequate to address the stated goals of ferreting out all the participants in the narcotics conspiracy.

McGee argues the other investigative techniques were in place and that other lesser

investigative measure could and should have been tried prior to the initiation of a wiretap. He repeatedly emphasized other techniques that were not tried (or not given long enough to see the full results) and argued they should have all been tried before the wiretap. The crux of the argument remains premised on the McGee's assertion that a wiretap is a last resort and should only be permitted when all other avenues have been explored, pursued, and failed.

From the outset, the Court notes that a wiretap application is one of the instances when *ex parte* communications are permissible. Additionally, the Court need not recite in detail all the contents of the affidavits – the record speaks for itself. It is clear that Agent Rulong and other law enforcement officers had conducted a significant and thorough investigation before seeking the wiretap authorizations. The United States provided affidavits that gave extensive details about investigative techniques that were utilized – the success and limitations of both and also detail why other techniques would either fail or meet with limited success. There is no question in the Court's mind that there was more than adequate probable cause for Judge DuBose to sign off on the authorizations.

Here, the evidence indicates none of the law enforcement techniques short of a wiretap would have enabled law enforcement to establish the clandestine and illegal relationship between the defendants. The very nature of a criminal conspiracy makes it difficult to determine relationships between the defendants and even identification of all relevant subjects. The Court finds that the agent adequately articulated the reasons why other investigative techniques would not find the success needed to penetrate this particular drug related conspiracy. The Court further finds law enforcement considered other techniques under the appropriate standard and logically concluded they were inadequate or likely to fail. Further, despite McGee's arguments to the contrary, "the partial success of alternative investigative measures…does not necessarily render

Page 29 of 34

electronic surveillance unnecessary." *Perez*, 661 F.3d at 581-82 (citing *United States v. Fernandez*, 388 F.3d 1199, 1236-37 (9th Cir. 2004) (concluding that the Government met the necessity requirement despite two confidential informants providing significant information)); *see also United States v. De La Cruz Suarez*, 601 F.3d 1202, 1214 n. 7 (11th Cir. 2010) (necessity requirement was met despite Government's use of confidential informants and consensual monitoring). Traditional techniques short of the wiretap would not have produced the same results. In addition, the use of traditional techniques short of a wiretap would have posed a greater danger to law enforcement, defendants, and other involved parties (including minors). Informants were used with some success to make controlled purchases of narcotics from several investigative targets – but were still limited given the very nature of a drug conspiracy. Further, pen registers and toll record analysis would not reveal sufficient information regarding the scope and individuals of the conspiracy. Up to this point, despite having tried several investigatory tools, law enforcement was unable to identify the full scope and membership of the drug trafficking organization. Judge DuBose found the affidavits on their face more than demonstrated the need to employ a wiretap and therefore satisfied the Title III necessity requirement. This Court agrees. Accordingly, the motions to suppress the wiretap evidence (Docs. 390, 617) are denied.

The Court also notes the Defendant filed his *pro se* motion to suppress traffic stop – which relates to the traffic stop that ultimately led to McGee's arrest and the seizure of the cocaine in the vehicle with him. *See* Doc. 674. He argues that the traffic stop was pre-planned and that makes it illegal. The motion is thin on anything resembling legal support. The Court notes from the United States' response (Doc. 697) and the evidence presented that the traffic stop is derivative of information obtained directly through the wiretap. Therefore, the Court will address it here.

When agents decided to initiate a traffic stop on June 13, 2024 as to the vehicle in which McGee was a passenger, they had intercepted several calls through the wire indicating the McGee and his co-conspirators had just orchestrated a shipment of five kilograms of cocaine from Houston, Texas to Mobile, Alabama. Agents had surveilled McGee and co-conspirator Reed leaving a stash location where the cocaine had been stored. When the agents followed the vehicle, they observed that it had illegally tinted windows and failed to maintain its lane of travel in violation of Alabama traffic laws. Then when they attempted to stop the vehicle, McGee and Reed attempted to flee – which is an additional violation of Alabama law. Under these circumstances, the agents were certainly permitted to stop the vehicle, arrest McGee and Reed, and seize the three kilograms of cocaine sitting in McGee's lap.

The agents' intentions play no role in the determination. The fact that they were looking for a reason to pull over the vehicle plays no role in the Fourth Amendment analysis. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997) ("The *Whren* Court squarely rejected the pretextual stop analysis" and that an officer's "ulterior motives" for a stop are not relevant so long as the stop is justified by probable cause). A traffic stop is valid "if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry [v. Ohio*, 392 U.S. 1 (1968)]." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008) (citing *United States v. Chanthasouxat*, 342 F.3d 1271, 1275 (11th Cir. 2003)); *see also Whren*, 517 U.S. at 810 (citations omitted) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). The "officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under

Page 31 of 34

the Fourth Amendment." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quotation omitted); *see also United States v. Forget*, 853 F. App'x 534 (11th Cir. 2021) (quoting *Harris*, 526 F.3d at 1337 ("But we have held that as long as an officer conducting a traffic stop has probable cause to believe a traffic violation has occurred, 'the officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'").

Here, Reed and McGee gave agents more than sufficient probable cause to stop them, especially once they decided to flee. *See United States v. Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003) ("[H]eadlong flight—wherever it occurs—is the consummate act of evasion." (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Moreover, a warrantless search of an automobile based upon probable cause derived from wiretaps is proper under the automobile exception. *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990). In this case, the seizure of the three kilograms of cocaine without a warrant is unquestionably permitted since it was sitting in plain view on McGee's lap once they did manage to pull over the vehicle. Therefore, McGee's arguments about pretext fail and the motion (Doc. 674) is denied.

**F.    Good Faith**

Lastly, even if any of the judges who issued search warrants (including the wiretap authorization issued by Judge DuBose) erred, the *Leon* good faith exception to the Exclusionary Rule applies in this case. *See United States v. Leon*, 468 U.S. 897 (1984). The *Leon* good faith exception "stands for the principle that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *United States v. Robinson*, 336 F.3d 1293, 1295-96 (11th Cir. 2003) (citing *United States v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002)); *see also*

*United States v. Mathis*, 767 F.3d 1264, 1276-77 (11th Cir. 2014) (reiterating principles of *Leon*).

The good faith exception also applies to wiretap applications and orders.  *See United States v. Malekzadeh*, 855 F.2d 1492, 1497 (11th Cir. 1988).  There are only four situations where the good faith exception does not apply:

> (1) where the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient- i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*Martin*, 397 F.3d at 1313 (citing *Leon*, 468 U.S. at 923).  There is no indication that any of these four situations occurred in this case on any of the warrants at issue.  The only one that is referenced by McGee is the first one and the Court finds that there was no misleading or false information presented.  To the extent there may or may not have been a gun in the fanny pack, that is only one piece of the presented evidence and even then, from the surveillance and photographs at issue, the Court finds that the fanny pack looks to the Court like it did contain a gun.  Whether it did or did not ultimately contain a gun is of little consequence –mistaken belief does not equate falsity.

The purpose of the exclusionary rule is to act as "a deterrent to willful conduct that violates individual rights."  *Malekzadeh*, 855 F.2d at 1497. Here, the law enforcement officers did exactly what the law requires.  It is undisputed that an application and affidavit for a wiretap was submitted to a federal district judge who then made a probable cause determination.  The same is true for the remaining search warrants sought and approved by both state and federal judges.  Law enforcement sought judicial permission and gave a neutral and detached judicial officer all of the information the judicial officer determined he or she needed to authorize the interceptions and search

authorization.  Nothing on its face would demonstrate to a reasonable law enforcement officer that the affidavits were in any way deficient in this or any other regard.  Moreover, despite some vague generalized assertions of falsity or misleading to the judge, there was no evidence presented nor does the record contain evidence that law enforcement was dishonest or reckless in preparing their affidavits and applications.  Consequently, the reliance on the wiretap and search authorizations was appropriate and accordingly, the good faith exception precludes suppression of the evidence.

### III.    CONCLUSION

Accordingly, the motions to suppress (Docs. 363, 389, 390, 617, 674) were and remain **DENIED**.

**DONE** and **ORDERED** this 3rd day of August 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE